UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


STEPHEN OUWINGA et al.,

              Plaintiffs,                                   Case No. 1:09-cv-60

v.                                                    HON. JANET T. NEFF

JOHN HANCOCK VARIABLE LIFE
INSURANCE et al.,

              Defendants.
_____/


## OPINION

       This is an interesting but complex case stemming from the nationwide promotion and sale

of a purported tax-deductible welfare benefit plan for business owners and executives—the Benistar

419 Plan, devised by Defendants Benistar 419 Plan Services, Inc., and Benistar Ltd. (the "Benistar

entities"), and sold to Plaintiffs Stephen, Leann, David and Christine Ouwinga as principals of

plaintiff Stoney Creek Fisheries and Equipment, Inc., based in Newaygo County, Michigan.  The

plan was determined by the Internal Revenue Service (IRS) to be, essentially, an abusive tax shelter.

       After the IRS disallowed plaintiffs' tax deductions, and assessed back taxes, penalty and

interest, plaintiffs filed this class action on behalf of themselves and all others similarly situated,

seeking recovery from defendants, including the Benistar entities; the local insurance agents, Kris

Lesley and Robert Fogg, and their affiliated insurance agency, Pasciak John Hancock Agency, that

sold the plan (the "Agent Defendants"); John Hancock Variable Life Insurance Company and John

Hancock Life Insurance Company (the "Hancock Defendants"); and a Connecticut attorney, John

H. Reid, III, and law firm, Edwards Angell Palmer & Dodge LLP, that provided legal opinion letters used to promote the Benistar 419 Plan tax advantages (the "Lawyer Defendants").

Plaintiffs have since voluntarily dismissed the Benistar defendants from this lawsuit on the basis of releases plaintiffs signed in 2006 (Am. C. A. Compl. ¶ 62), although these entities are still alleged to be co-conspirators (*id.* ¶¶ 25, 62, 63).  The case is now before the Court on motions to dismiss by the remaining defendants.  Having considered extensive briefing by the parties, recent supplemental authority, and having now heard oral argument, the Court renders its decision on the motions with respect to each claim against the remaining seven defendants.  The Court concludes that defendants' motions are properly granted, and this case should be dismissed.

## I. PLAINTIFFS' ALLEGATIONS

Plaintiffs' Amended Class Action Complaint[1] alleges eight claims:

1.      Violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c) (against all defendants);

2.      Violations of RICO, 18 U.S.C. § 1962(d), by Conspiring to Violate § 1962(c) (against all defendants);

3.      Fraudulent Misrepresentation/Omission (against the John Hancock Defendants);

4.      Negligent Misrepresentation (against all defendants);

5.      Unjust Enrichment (against the John Hancock Defendants);

6.      Breach of Fiduciary Duty (against the John Hancock Defendants);

7.      Breach of Contract (against John Hancock Defendants);

---

[1]For ease of reference, plaintiffs' Amended Class Action Complaint (Dkt 3), will simply be referenced as the "Complaint" in this Opinion.

8.      Violation of State Consumer Protection Laws (based on consumer protection laws in 38 states and the District of Columbia) (against the John Hancock Defendants).

Plaintiffs' claims are premised on an alleged scheme, involving all defendants and the Benistar entities, to perpetrate a fraud upon plaintiffs by representing to plaintiffs that their participation in the "Benistar 419 Plan," through contributions in the form of premiums for the purchase of multi-million dollar individual life insurance policies, was fully tax deductible as a "welfare benefit plan" under IRC § 419A(f)(6) as a "10 or more employer plan."[2]  Plaintiffs assert that, in fact, the IRS had indicated through various notices, rulings, and regulations, that such plans did not qualify under § 419A(f)(6).  The IRS ultimately disallowed plaintiffs' tax deductions for their contributions to the Benistar 419 Plan, effectively deeming the Benistar 419 Plan an abusive tax shelter.

The Complaint gives a detailed account of the business dealings, conduct and representations underlying plaintiffs' claims.  Briefly stated, in September 2001, plaintiffs were approached by Defendant Lesley, a former high school classmate of David Ouwinga, about John Hancock products Lesley thought might interest plaintiffs (Am. C. A. Compl. ¶ 33).  At the time, the individual plaintiffs were the majority owners of plaintiff Stoney Creek Fisheries, an aquaculture products company founded by Plaintiffs Steve and Leann Ouwinga in 1970 that had grown to serve 22,000 customers in all 50 states (*id.*).  Lesley represented to plaintiffs that they could greatly reduce their tax liabilities through the Benistar 419 Plan, a well-known plan promoted by John Hancock (*id.* ¶¶

---

[2]Section 419A(f)(6) applies to plans in which "(i) more than one employer contributes, (ii) no employer normally contributes more than 10 percent of the total contributions contributed under the plan by all employers and (iii) the plan does not maintain experience-rating arrangements with respect to individual employers" (Am. C. A. Compl. ¶ 2).

34-36).  After further discussions and sales presentations by Lesley and Fogg, including an October 18, 2001 meeting that involved plaintiffs' local attorney and their accountant, and a tax attorney acting on behalf of Lesley and Fogg, who participated by telephone, plaintiffs decided in late 2001 to participate in the Benistar 419 Plan, which purchased initial life insurance policies on plaintiffs' lives:  $4,000,000 for Leann Ouwinga, $3,500,000 for Steve Ouwinga, and $10,000,000 for David Ouwinga (*id.* ¶¶ 37-39, 51).  At the time, all three plaintiffs had adequate life insurance and no need for additional coverage (*id.* ¶ 51).

The Complaint details the involvement of the various defendants in the course of plaintiffs' participation in the Benistar 419 Plan over the next several years, despite growing indications that the IRS did not recognize plans such as the Benistar 419 Plan as qualifying § 419A(f)(6) plans. Lesley and Fogg continued to promote the Plan, acting on behalf of their principals, the John Hancock Defendants.  Plaintiffs received numerous documents from defendants promoting the Benistar 419 Plan, lauding the tax benefits, and attesting that the contributions were fully tax deductible (Am. C. A. Compl. ¶¶ 39-41, 43).  Plaintiffs received two large loose-leafed binders (the "Benistar Books") with purportedly independent legal opinion letters from the Edwards Angell Defendants, particularly Defendant Reid (*id.* ¶¶ 40, 45, 49), and printed Benefit Concepts Bulletins (*id.* ¶¶ 52-53), all of which provided assurances and praise for the Benistar 419 Plan and its tax benefits.[3]

---

[3]Plaintiffs assert that the Benistar Books included only selective portions of law that supported the Benistar sales pitch, "to impress and overawe unsophisticated investors, [such as plaintiffs], and any tax and legal professionals from whom they might seek advice and who are not specialists in the area of tax shelters" (Am. C. A. Compl. ¶ 44).

In 2003, however, defendants apparently determined that the Benistar 419 Plan required modifications, and informed plaintiffs that the IRS had changed the rules, and plaintiffs would need to contribute additional money to purchase new life insurance policies to maintain the Plan (Am. C. A. Compl. ¶ 54). Lesley and Fogg assured plaintiffs that while the IRS changes might signal that the "loophole" would soon close, there was no reason to be concerned about the tax benefits previously claimed or those to be claimed in 2003 (*id.*). Also in 2003, Defendant Reid, an attorney with Edwards Angell, issued letters indicating that the Benistar 419 Plan was not a tax shelter and remained viable against any challenge by the IRS (*id.* ¶ 55). After these and similar other assurances from defendants, plaintiffs ultimately contributed additional money to continue the Plan, and the Plan purchased additional policies for each of the plaintiffs (*id.* ¶ 60).

In January 2007, plaintiffs were notified by the IRS that their tax returns for 2003 and 2004 were going to be examined (*id.* ¶ 64). On April 3, 2008, the IRS issued Income Tax Discrepancy Adjustments, disallowing plaintiffs' deductions related to the Benistar 419 Plan (*id.* ¶ 65). In 2009, plaintiffs filed this action seeking recovery for alleged losses related to their participation in the Benistar 419 plan.

## II. DEFENDANTS' MOTIONS

### A. RICO Claims

Plaintiffs' sole federal claims are premised on alleged violations of RICO, 18 U.S.C. § 1962(c) and (d). Defendants have filed a Joint Motion to Dismiss the RICO claims pursuant to Federal Rule of Civil Procedure 12(b)(6) (Dkt 62). Defendants argue first that the RICO claims are

barred by the Private Securities Litigation Reform Act[4] (PSLRA), and, second, that plaintiffs'
Complaint fails to meet the pleading requirements for RICO claims.

"'A [Rule 12(b)(6)] motion to dismiss for failure to state a claim is a test of the plaintiff's
cause of action as stated in the complaint, not a challenge to the plaintiff's factual allegations.'"
*Lambert v. Hartman,* 517 F.3d 433, 439 (6th Cir. 2008) (quoting *Golden v. City of Columbus,* 404
F.3d 950, 958-59 (6th Cir. 2005)).  In deciding the motion, the court must treat all well-pleaded
allegations in the complaint as true and draw all reasonable inferences from those allegations in
favor of the nonmoving party.  *Id.*; *Moon v. Harrison Piping Supply,* 465 F.3d 719, 723 (6th Cir.
2006).        "A claim survives this motion where its '[f]actual allegations [are] enough to raise
a right to relief above the speculative level on the assumption that all of the complaint's allegations
are true.'"  *Zaluski v. United Am. Healthcare Corp.,* 527 F.3d 564, 570 (6th Cir. 2008) (quoting *Bell
Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007)).  The complaint must present enough facts
to state a plausible claim for relief.  *Ashcroft v. Iqbal,* ___ U.S. ___, 129 S. Ct. 1937, 1950 (2009);
*Twombly,* 550 U.S. at 570.  Thus, it "must contain either direct or inferential allegations respecting
all the material elements to sustain recovery under [a] viable legal theory."  *League of United Latin
American Citizens (LULAC) v. Bredesen,* 500 F.3d 523, 527 (6th Cir. 2007).

"Determining whether a complaint states a plausible claim for relief [is] a context-specific
task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*,
129 S. Ct. at 1950.  The court is "'not bound to accept as true a legal conclusion couched as a factual
allegation,'"  *Id.* (quoting *Twombly* 550 U.S. at 555 (internal quotation marks omitted)).

---

[4]Pub. L. No. 104-67, 109 Stat. 737 (1995).

1.  PSLRA Bar

Defendants argue that plaintiffs' RICO claims fail in their entirety as a threshold matter because they are barred by the PSLRA, which amended RICO "to eliminate as a predicate act for a private cause of action under [RICO], any conduct actionable as fraud in the purchase or sale of securities." *Mathews v. Kidder Peabody & Co.,* 161 F.3d 156, 157 (3d Cir. 1998) (Defs. J. Br. at 5). Defendants contend that plaintiffs' RICO claim is barred even if plaintiffs do not expressly plead securities fraud as a predicate act for their RICO claim because the test is whether the underlying facts *could* present a claim for violations of securities laws (*id.*).

Plaintiffs argue that their RICO claims are not barred because the PSLRA only bars claims that are based on conduct that is *actionable* as securities fraud, and plaintiffs' RICO claim does not rely on predicate acts actionable as securities fraud.  *See Bald Eagle Area Sch. Dist. v. Keystone Financial, Inc.,* 189 F.3d 321, 330 (3d Cir. 1999).  Plaintiffs assert that the fraudulent scheme alleged in this action is totally devoid of any activities that could form the basis of an action for securities fraud (Pls. Resp. to J. Br. [hereafter, "Pls. Resp."] at 11).  Instead, at the center of the scheme are transactions involving the Plan, and defendants do not contend that the Plan is itself a security.  It was the Plan that purchased the variable life insurance (the securities), not the plaintiffs, and there is no alleged fraud in connection with the sale of the variable life insurance to the Plan (*id.* at 11-12).  Plaintiffs thus contend that absent any connection between the fraud and the securities, the PSLRA does not apply.

The PSLRA "forecloses civil RICO claims that are based upon conduct that would have been actionable as securities fraud." *Mathews,* 161 F.3d at 159.  "It is clear from the legislative history

that the intention behind the RICO Amendment was 'to address a significant number of frivolous actions based on alleged securities law violations.'"  *Id.* at 164 (citation omitted).

"Prior to 1995, a private plaintiff could assert a civil RICO claim for securities law violations sounding in 'garden variety' fraud."  *Bald Eagle,* 189 F.3d at 327.  Plaintiffs regularly elevated fraud to alleged RICO violations to take advantage of RICO's "potential bonanza of recovering treble damages."  *Id.*  To preclude such maneuvering, in 1995, Congress enacted the PSLRA to amend RICO by narrowing the kind of conduct that could qualify as a predicate act.  *Id.*

Section 107 of the PSLRA (known as the "RICO Amendment") provides in relevant part as follows:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, *except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962.* …

18 U.S.C. § 1964(c) (emphasis added).

According to the Conference Committee Report accompanying § 107, "the amendment was intended not simply 'to eliminate securities fraud as a predicate act in civil RICO claims,'" but also to prevent "'plead[ing] other specified offenses, such as mail or wire fraud, as predicate acts'" if the offenses are based on conduct that would have been actionable as securities fraud.  *Bald Eagle,* 189 F.3d at 327 (quoting H.R. Conf. Rep. No. 104-369, at 47 (1995)); *see also Thomas H. Lee Equity Fund V, L.P. v. Mayer Brown, Rowe & Maw LLP,* 612 F. Supp. 2d 267, 281 (S.D.N.Y. 2009).

The parties agree that the PSLRA operates to foreclose a civil RICO claim that is based on conduct that *would have been actionable as securities fraud,* but they disagree whether the conduct

8

alleged by plaintiffs so qualifies.  Each side cites case law that seemingly supports a contrary

conclusion.  None of the cases cited addresses the specific circumstances presented here.

There is little definitive guidance on any test for determining whether conduct underlying

a RICO claim is actionable as securities fraud.  Plaintiffs have not pled securities fraud, and

defendants provide no specific reference under securities law for a fraud action in the circumstances

of this case.  In resolving this issue, the courts have generally considered whether the fraudulent

conduct occurred "in connection with" the purchase or sale of securities.  The justification for this

approach was set forth in a recent unpublished decision of the Connecticut district court as follows:

> Under Section 10(b) of the Securities Exchange Act of 1934, the
> determination of whether conduct is actionable as securities fraud focuses on whether
> the fraudulent conduct is "in connection with the purchase or sale of any security."
> 15 U.S.C. § 78j(b). The Supreme Court has defined the scope of "in connection
> with" very broadly to encompass a "fraudulent scheme in which the securities
> transactions and breaches of fiduciary duty coincide." *S.E.C. v. Zandford,* 535 U.S.
> 813, 825 [] (2002); *see also Ling v. Deutsche Bank,* AG, No. 04 CV 4566 (HB), 2005
> WL 1244689, at *3 (S.D.N.Y. May 26, 2005) ("[T]he requirement is satisfied when
> the securities transactions and breaches complained of coincide and are not
> independent events.").
>
> * * *
>
> In determining whether misrepresentations coincided with the purchase or
> sale of securities, courts consider the allegedly fraudulent scheme as a whole. For
> instance, in *Stechler v. Sidley, Austin Brown & Wood, L.L.P,* 382 F. Supp. 2d 580
> (S.D.N.Y. 2005), investors alleged that several legal and financial services firms
> conspired to market, sell and implement a tax shelter, which they knew or should
> have known would be considered unlawful by the IRS. One part of the tax shelter
> strategy required investors to acquire and sell common stock. In response to
> Plaintiffs' arguments that the connection between the common stock transactions and
> the alleged fraud was tenuous, the court held that the strategy as a whole, not the
> individual steps required to carry it out, must be analyzed. Since the tax strategy
> involved the purchase and sale of securities, the RICO claims were barred. *Id.* at
> 597-98. *See also Bald Eagle Area Sch. Dist.,* 189 F.3d at 330 (plaintiffs' "surgical
> presentation of the cause of action" could not avoid the determination that the
> conduct giving rise to the predicate offenses amounted to securities fraud); *Ling,*
> 2005 WL 1244689, at *4 ("If one predicate act alleges breaches of duty coincident
> with securities transactions then the whole scheme is subject to the PSLRA bar.
> Because here the Plaintiffs contend the wrongful acts were committed as part of a

> single fraudulent scheme, all of the components must be considered together for securities fraud purposes."); *Seippel v. Jenkens & Gilchrist, P.C.,* 341 F. Supp. 2d 363, 373 (S.D.N.Y. 2004) (Plaintiff's RICO claims based on Defendants' allegedly fraudulent tax shelter, which was supposed to reduce plaintiff's tax liability when exercising his stock options, were barred because the "sale of [plaintiff's] stock was an integral part of the scheme").

*Levinson v. PSCC Services, Inc.,* No. 3:09-CV-00269 (PCD), 2009 WL 5184363, at *7 ( D. Conn. Dec. 23, 2009).

Contrary to defendants' arguments, the Court concludes on the record before it, that the securities transactions in this case, i.e., the purchase of variable life insurance policies, were not integral to or "in connection with" the fraudulent scheme as a whole. Instead, the securities transactions and breaches complained of are essentially independent events. The fact that the life insurance policies chosen for plaintiffs happened to be "variable" policies, thereby qualifying as "securities," is merely incidental. Unlike those cases cited in *Levinson, supra,* in which the courts found actionable securities fraud and applied the PSLRA bar, here the connection between the fraud and the securities transactions is far more tenuous.

Defendants have failed to persuade the Court on the present record that the conduct at issue would be actionable as securities fraud. This is particularly so because defendants offer no analysis or specific authority under which plaintiffs could proceed with a cause of action for securities fraud. Accordingly, the Court declines to dismiss plaintiffs' RICO claims on the ground that the claims are barred by the PSLRA.

### 2. Failure to Plead Elements of a RICO Claim

Defendants also jointly seek dismissal of Counts 1 and 2 on the grounds that plaintiffs have failed to plead the necessary elements of their RICO claims under § 1962(c) and (d).

10

a.  18 U.S.C. § 1962(c)

Section 1962(c) provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

To establish a claim under § 1962(c), a plaintiff must show "'(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'"  *Moon,* 465 F.3d 719, 723 (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496 (1985)); *see also Paycom Billing Servs., Inc. v. Payment Res. Int'l,* 212 F. Supp. 2d 732, 735 (W.D. Mich. 2002).  Defendants argue that plaintiffs have failed to properly plead an "enterprise," "conduct" or "racketeering activity."  Notwithstanding the *Twombly* standard, which requires only that plaintiffs plead a plausible claim, the Court concludes that such a showing is lacking, particularly with respect to the RICO "conduct" and the alleged "enterprise."

i.  Conduct Element

To state a claim under § 1962(c), a plaintiff must set forth allegations to establish that the defendant conducted or participated, "directly or indirectly, in the conduct of [the RICO] enterprise's affairs."  18 U.S.C. § 1962(c).  That is, to be subject to § 1962(c) liability, one must participate in the operation or management of the enterprise itself:

> In order to "participate, directly or indirectly, in the conduct of such enterprise's affairs," one must have some part in directing those affairs. Of course, the word "participate" makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase "directly or indirectly" makes clear that RICO liability is not limited to those with a formal position in the enterprise, but some part in directing the enterprise's affairs is required. The "operation or management" test expresses this requirement in a formulation that is easy to apply.

11

*Reves v. Ernst & Young,* 507 U.S. 170, 179 (1990).  Liability under § 1962(c) requires a "showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs."  *Id.* at 185 (emphasis in original).

Defendants argue that plaintiffs have failed to allege that any of the defendants conducted or participated in any affairs beyond the operation of their own business (Defs. J. Br. at 16-19). Defendants state that, to the contrary, plaintiffs allege that the John Hancock Defendants' role in the alleged enterprise was to promote and sell insurance policies (*see* Am. C. A. Compl. ¶¶ 4, 106 B), which is merely participation in their own affairs, namely, selling insurance (Defs. J. Br. at 16-17). Likewise, defendants assert that nothing in the Complaint suggests that the Agent Defendants participated in the "operation or management" of the alleged enterprise, because the agents at most sold plaintiffs interests in the Benistar Plan, which was essentially "pre-packaged" (*id.* at 17). Similarly, the Lawyer Defendants merely rendered traditional legal services to the alleged RICO enterprise, in the form of tax opinion letters, which is insufficient to establish the "conduct" element (*id.* at 18).

The Court finds these arguments persuasive and, accordingly, concludes that plaintiffs have failed to allege the requisites of the conduct element for a RICO claim under § 1962(c).  In arguing that they have properly alleged the "conduct" element, plaintiffs cite their allegations that the Hancock Defendants participated in the enterprise's affairs in a manner distinct from their own business by entering into a conspiracy to promote a tax plan that they knew or should have known would fail, allowing their agents to be front-line promoters, and withholding critical and material information that would have precluded plaintiffs' participation in the scheme (Pls. Resp. at 18). However, plaintiffs' allegation of a conspiracy is merely conclusory.  There is little or no factual

support for these allegations. *Iqbal*, 129 S. Ct. at 1950. The court is not obligated to accept as true legal conclusions couched as factual allegations. *Id.* at 1950-51.

Likewise, plaintiffs argue that the Agent and Lawyer Defendants participated in the operation or management of the alleged RICO enterprise because these defendants are at the core of the fraudulent scheme as the participants who played a critical role in promoting the Plan (Pls. Resp. at 19). Plaintiffs therefore contend that these defendants' activities rise far above the "simple sale of insurance policies or rendering of legal services," sufficient to rise to RICO culpability (*id.* at 20). Plaintiffs' allegations in this regard, again, are merely conclusory, and as such, the court is not obligated to accept these legal conclusions, couched as factual allegations, as true. *Iqbal*, 129 S. Ct. at 1950-51.

### ii.  Enterprise Element

Even if plaintiffs' allegations sufficiently allege culpable conduct different and apart from defendants' own business affairs, which the Court doubts, the Court concludes in this same vein that plaintiffs have failed to sufficiently plead a RICO enterprise.

A RICO enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). A RICO enterprise alleged as an association-in-fact must be pled as existing separately from the defendants' activity; it may not merely consist of the named defendants. *German Free State of Bavaria v. Toyobo Co.,* 480 F. Supp. 2d 958, 967-68 (W.D. Mich. 2007); *Durant v. ServiceMaster Co.,* 159 F. Supp. 2d 977, 981-82 (E.D. Mich. 2001). The enterprise and the alleged pattern of racketeering cannot have a singular existence. *See United States v. Turkette,* 452 U.S. 576, 583 (1981) (existence of an enterprise is shown "by evidence of an ongoing

organization, formal or informal, and by evidence that the various associates function as a continuing unit," while a pattern of racketeering activity is shown by "evidence of the requisite number of acts of racketeering committed by the participants in the enterprise.")  "That is, the mere commission of some felonies by a few persons cannot constitute an 'enterprise' if there is no other infrastructure between them in support of a continuing relationship."  *Robinson v. Kidder, Peabody & Co., Inc.,* 674 F. Supp. 243, 246 (E.D. Mich. 1987).

Defendants argue that plaintiffs have failed to identify an enterprise distinct from the alleged pattern of racketeering activity (Defs. J. Br. at 14).  Defendants point out that although plaintiffs allege that "[t]he Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engage" (Am. C. A. Compl. ¶ 101), they ultimately fail to allege that the enterprise functions for any purpose distinct from selling life insurance policies (Defs. J. Br. at 15).  Thus, plaintiffs effectively allege that defendants came together solely for the purpose of committing the predicate crimes, which fails to establish a distinct entity separate and apart from the alleged pattern of racketeering (*id.* at 13).

Plaintiffs argue that there is no such "distinctness" requirement for a RICO claim (Pls. Resp. at 16), citing *United States v. Collins,* 927 F.2d 605, 1991 WL 23558, at *15 (6th Cir. 1991) (unpublished table decision).  However, plaintiffs overlook that in *Collins*, the court observed only that there need not be distinct *proofs* with regard to the enterprise and the "pattern of racketeering activity," not that the enterprise and the racketeering activity need not be distinct.  *Id.*

Nonetheless, the Supreme Court recently clarified whether an association-in-fact enterprise under RICO "must have 'an ascertainable structure beyond that inherent in the pattern of racketeering activity in which it engages.'"  *Boyle v. United States,* ___ U.S. ___; 129 S. Ct. 2237,

2241 (2009) (quoting Pet. for Cert. i). Expanding on the principles set forth in *Turkette,* the Court

reiterated that functioning as a "continuing unit" is a foundational hallmark of an association-in-fact

enterprise:

> [W]e explained in *Turkette* that "an enterprise includes any union or group of individuals associated in fact" and that RICO reaches "a group of persons associated together for a common purpose of engaging in a course of conduct." 452 U.S., at 580, 583, 101 S. Ct. 2524. Such an enterprise, we said, "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.* at 583, 101 S. Ct. 2524.

*Boyle*, 129 S. Ct. at 2243.

The Court expounded on these concepts, holding that an association-in-fact enterprise must

have some "structure," which minimally includes "three structural features: a purpose, relationships

among those associated with the enterprise, and longevity sufficient to permit these associates to

pursue the enterprise's purpose." *Id.* at 2244. The concept of "association" requires both

interpersonal relationships and a common interest. *Id.* And while the existence of an enterprise is

an element distinct from the pattern of racketeering activity, and "proof of one does not necessarily

establish the other," the evidence to prove these distinct elements may "coalesce" in particular cases.

*Id.* at 2245 (quoting *Turkette,* 452 U.S. at 583) (footnote omitted).

Plaintiffs argue that even if a "distinctness" requirement is imposed, they have met this

requirement to establish this distinct element (Pls. Resp. at 16). Plaintiffs state that they have first

alleged that defendants were associated-in-fact for the purpose of developing and marketing

§ 419A(f)(6)-compliant plans and selling insurance in connection with those plans. Plaintiffs further

state that as a distinct matter, they have alleged that with respect to the named plaintiffs, defendants

"formed a specific 'employer welfare benefit plan' to use as a RICO enterprise that was not intended

to be a § 419A(f)(6)-compliant plan," but rather one designed solely to facilitate the sale of life

insurance policies and the provision of legal and administrative services that would generate significant commissions, marketed and sold as a means to reduce liabilities (Pl. Resp. at 17).

Despite plaintiffs' arguments, their alleged association-in fact enterprise, comprised of the instant defendants, has none of the defining characteristics of such an enterprise.  There is no structure or *common* purpose, there are no interpersonal relationships amongst the defendants—in short, no evidence that "the various associates function as a continuing unit" to carry out a pattern of racketeering activity.

The Court finds plaintiffs' argument unpersuasive and contrary to common sense. *See Iqbal,* 129 S. Ct. at 1950.  Plaintiffs' artificial delineation of a RICO enterprise by simply alleging mirror-image, ill-motivated activity of normal business conduct, rings hollow.  If this were so, all business conduct gone awry would constitute a per se RICO enterprise.  Absent something more, plaintiffs have failed to allege the existence of an enterprise "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *See Turkette,* 452 U.S. at 583.

Here, there is no indication that this group was organized, even informally.

The courts have struggled with the definitional constructs of the elements of a RICO claim, perhaps accounting for the varied case-specific outcomes and the continually evolving case law.[5] This may be due in part to a tension between the desirable wide reach of the statute to stymie corruption but a more narrow legitimate use of the statute to redress private injury by civil litigants. *See Boyle,* 129 S. Ct. at 2243, 2246-47 (referencing the courts' refusal to sanction narrowing

---

[5]At oral argument, the Court specifically inquired whether there was any recent or supplemental authority bearing on the issues presented, and counsel for each party responded in the negative.

constructions of the statute).  Whatever the reason, the courts are left to discern as best they can whether the prerequisites of a RICO claim are met on the facts presented.

Because the Court concludes that plaintiffs have failed to sufficiently allege the "conduct" and "enterprise" elements of a § 1962(c) claim, the Court need not consider the additional RICO arguments as to particular defendants or resolve the parties' remaining disputes on the elements, e.g., (1) whether plaintiffs can establish a viable association-in-fact "enterprise" based on a group of corporate entities and individuals, and (2) whether plaintiffs have established a pattern of "racketeering activity."

### b.  18 U.S.C. § 1962(d)

Section 1962(d) provides: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  Because plaintiffs have failed to establish a claim under subsection (c), their conspiracy claim under subsection (d) fails for the same reason.  *See Craighead v. E.F. Hutton & Co., Inc.,* 899 F.2d 485, 495 (6th Cir. 1990); *see also Salinas v. United States,* 522 U.S. 52, 65-66 (1997) (discussing the requisites of a RICO conspiracy claim).  Plaintiffs' allegations regarding a conspiracy are merely conclusory.

### B.  State Law Claims

Plaintiffs allege six claims under state law:  (1) a claim of Negligent Misrepresentation against all defendants, and (2) five claims against the John Hancock Defendants, including Fraudulent Misrepresentation/Omission, Unjust Enrichment, Breach of Fiduciary Duty, Breach of Contract, and Violation of State Consumer Protection Laws (based on consumer protection laws in 38 states and the District of Columbia).

17

1.  Claims against John Hancock Defendants

The John Hancock Defendants seek dismissal of all five state law claims against them on the grounds that all of these claims allege injury as a result of John Hancock's purported misrepresentation about the potential tax advantages of purchasing an insurance policy, and such claims are therefore foreclosed by the explicit disclaimers and disclosures that appear in multiple documents signed by plaintiffs.  The Court agrees.

In presenting and marketing the Benistar 419 Plan to plaintiffs, John Hancock gave plaintiffs multiple disclaimers explaining that John Hancock was making no representations about the potential tax benefits under the Plan and that John Hancock did not purport to offer tax or legal advice (Am. C. A. Compl. ¶¶ 42, 59).  In the Benistar Books provided to plaintiffs, John Hancock stated that it "makes no representations" as to the durability of the tax benefits and that it did not "offer[] or have the authority to offer any legal or tax advice" about the Benistar Plan (*id.* ¶ 42) (Defs. J. Hancock Br. at 2-3).  The Benistar Books contained a "Disclosure and Acknowledgment Statement" from John Hancock, stating as follows:

> In particular, the Carrier [John Hancock] makes no representations concerning the following issues:
>
> 1.      Whether or not the Employer will be allowed a current income tax deduction for amounts contributed to the Plan;
>
> 2.      Whether or not an income tax deduction allowed in any taxable year may again be allowed in any subsequent taxable year for any reason;
>
> * * *
>
> [The undersigned Employer, on its own behalf, and on behalf of its Participating Employees, hereby acknowledges the following:]
>
> 3.      Neither the Carrier nor any of its directors, officers, employees, agents, General Agents, or other representatives have offered or have the authority

18

> to offer any legal or tax advice concerning the adoption and/or participation in the Plan. …

(Am. C. A. Compl. ¶ 42).  In the "Employer Acknowledgments," section 3, of the same document, plaintiffs acknowledged that they had not "relied upon any legal or tax advice, if any" provided by John Hancock:

> a.    Neither I nor the Employer have relied upon any legal or tax advice, if any, provided to me by the Sponsor, the Insurer [John Hancock] or the Trustee;
>
> b.    Membership in this Plan, and the tax consequences stemming therefrom, are the responsibility of the Employer and the responsibility of the Employer's independent tax and legal advisers;
>
> * * *
>
> g.    Neither the Plan Sponsor, the Insurer [John Hancock] nor the Trustee represents, guarantees or promises that any particular legal or tax consequences will result from the Employer's adoption of or any Employees' participation in the Plan[.] …

(Defs. J. Br. Ex. 5.)   Additionally, John Hancock gave Plaintiffs an "Acknowledgment and Disclosure" form reiterating that John Hancock and its representatives would not be giving tax or legal advice and emphasizing that plaintiffs should "speak with [their] independent tax/legal advisors before" purchasing the policy:

> Please understand that John Hancock has not made a determination that this plan achieves any specific tax or other objectives. . . . Accordingly, it is important that you speak with your independent tax/legal advisors before you complete the purchase of the policy and go forward with your plan. . . . Please further understand that John Hancock has not authorized its representatives to provide you with tax or legal advice, and you may not rely on any such advice provided by your John Hancock representative. John Hancock's role is limited solely to providing you with, and servicing, your life insurance policies.

19

(*Id.*)  John Hancock also issued a separate "Disclaimer" signed by plaintiffs, stating that "any opinions or representations made by John Hancock" are "subject to subsequent determinations by the IRS and/or other authorities":

> With respect to the purchase of products from John Hancock Financial Services, Inc. . . . in connection with the participation of the undersigned employer [Plaintiff Stoney Creek Fisheries and Equipment, Inc.] in [the] Benistar 419 [Plan], such employer understands that any opinions or representations made by John Hancock Financial Services or any agent, employee, broker or representative of [John Hancock], pertaining to the Plan … are subject to subsequent determinations by the IRS and/or other authorities …. Thus, with regard to this Plan, the undersigned employer acknowledges that it is advised to consult with its own legal counsel and tax advisors and understands that [John Hancock] makes no representations as to the federal or state income tax consequences to the Plan and/or its participants.

(Defs. J. Hancock Br. Ex. 1.)

Defendants argue that in light of the numerous disclaimers and disclosures provided, plaintiffs' state law claims against the John Hancock Defendants fail.  Plaintiffs respond that defendants' arguments ignore factual issues as to the validity and scope of the disclaimers (Pls. Resp. at 32).  Plaintiffs argue that because the disclaimers were induced by fraud, are ambiguous and general, and do not extend to advice and misrepresentations provided by the alleged co-conspirators or provided after the disclaimers were signed, the motion to dismiss is premature and should be denied (*id.* at 37).  The Court disagrees.  The disclaimers and disclosures provided to plaintiffs were extensive, repetitive, and unambiguous.  Plaintiffs cannot now seek to escape the effect of these disclaimers by disavowing any responsibility for their own failure to inform themselves of the tax ramifications of the Benistar 419 Plan.  The Court therefore grants the John Hancock Defendants' motion to dismiss the five state law claims against them.

2. Negligent Misrepresentation

Plaintiffs acknowledge that to state a claim of negligent misrepresentation under Michigan law, they must show justifiable reliance to their detriment on information prepared without reasonable care by one who owed the relying party a duty of care (Pls. Resp. at 31). *Fejedelem v. Kasco,* 711 N.W.2d 436, 437 (Mich. Ct. App. 2006). In light of the disclaimers and disclosures discussed above, plaintiffs' negligent misrepresentation claim against the John Hancock Defendants fails. The disclaimers and disclosures negate any conceivable reliance, let alone justifiable reliance, on the specific tax implications of the Benistar 419 Plan for plaintiffs. Because the Agent Defendants join in the arguments of the John Hancock Defendants, the same reasoning applies to them.

The Court further concludes that plaintiffs cannot state a viable claim against the Lawyer Defendants. Plaintiffs cannot establish that the Lawyer Defendants owed plaintiffs a duty of care where no relationship existed between these parties. The tax opinion letters were provided to Benistar and expressly stated that they were not to be relied on by anyone else, including "any particular employer participating in the Benistar 419 Plan" (Lawyer Defs. Br. Ex. 3 at 6). Moreover, mere opinions are generally not actionable as misrepresentations. *City Nat'l Bank of Detroit v. Rodgers & Morgenstein,* 399 N.W.2d 505, 507-08 (Mich. Ct. App. 1986).

III. PLAINTIFFS' SUPPLEMENTAL AUTHORITY

In their Second Supplemental Authority filed in this case (Dkt 83), plaintiffs submit a decision of the United States Tax Court, *Curcio v. Comm'r,* T.C.M. (RIA) 2010-115, 2010 WL 2134321 (U.S. Tax Ct. May 27, 2010), in which the court analyzed "three groups of test cases

selected to resolve a number of disputes regarding companies participating in the Benistar 419 Plan & Trust." *Id.* at * 2.  The issues decided were:

> first, whether payments to the Benistar 419 Plan & Trust for employee benefits are ordinary and necessary business expenses under section 162(a), and if so, whether the payments are deductible contributions to a multiple-employer welfare benefit plan under section 419A(f)(6), and, second, whether petitioners are liable for accuracy-related penalties under section 6662.

Plaintiffs contend that *Curcio* undermines any argument by defendants that the tax treatment of 419 plans like the Benistar Plan was not yet decided as of the time of the events alleged in this case and that certain theories "like fraud and negligent misrepresentation are not cognizable as a result" (Pls. 2d Suppl. Auth'y, Dkt 83, at 1-2).  *Curcio*, is at best, a double-edged sword in this debate.  First, the fact that the Tax Court even needed to consider three groups of *test cases* regarding participation in the Benistar 419 Plan undercuts plaintiffs' assertion that all of the tax issues surrounding the Plan were clear "based on an arsenal of tax law spanning eight decades" (*id.* at 2 (citing *Curcio* ,2010 WL 2134321, at *26, and *Neonatology Associates, P.A. v. Commissioner,* 115 T.C. 43, 88 (2000)).  Second, if the tax law was that clear, then plaintiffs would have little justification for their participation in an obvious tax abuse shelter.

As to plaintiffs' allegation that the Benistar sales pitch impressed and overawed them as unsophisticated investors (Am. C. A. Compl. ¶ 44), the *Curcio* decision is even more telling in rejecting the petitioners-taxpayers' claim that they acted with reasonable cause and in good faith under § 6664 in participating in the Benistar 419 Plan.  *See id.* at *24-25.  The Tax Court declined to sanction reliance on the generic Edwards & Angell tax opinion, noting that "[t]he disclosure and acknowledgment form signed by the participating companies expressly acknowledges that they did not rely upon tax advice from Benistar Plan."  *Id.* at *24.  *Curcio* underscores that ultimate

responsibility rested with the taxpayers for their participation in the Benistar Plan:

> "Carpenter [the architect of the Benistar 419 Plan] wrote A Professional's Guide to 419 Plans because most financial advisers thought Carpenter's section 419 plans were too good to be true. In these cases, they were. *See Neonatology Associates, P.A. v. Commissioner,* 299 F.3d at 234; sec. 1.6662-3(b)(1)(ii), Income Tax Regs. (stating that negligence is strongly indicated where a taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction that would seem to a reasonable and prudent person to be too good to be true under the circumstances).

*Curcio*, 2010 WL 2134321 at *25. *See also McGehee Family Clinic, P.A. v. Comm'r,* T.C.M. (RIA) 2010-202, 2010 WL 3583386 (U.S. Tax Ct. Sept. 15, 2010) (further examining the tax consequences of participation in the Benistar 419 Plan).

## IV.  CONCLUSION

The Motions before the Court have been extensively and ardently argued.  At the heart of this case is the simple question whether plaintiffs are entitled to recoup for their ill-fated attempt to reduce their tax liabilities through a sophisticated promise of a safe harbor for their investments. Regardless of this Court's view of the outcome of plaintiffs' tax planning endeavor, the Court is firmly persuaded that RICO is not the appropriate vehicle for redress under the circumstances presented.  Nor do the claims for plaintiffs' losses survive as posited under various state laws. Unfortunately, the parties most directly culpable for this debacle—the Benistar defendants—were the first to escape liability through dismissal from this suit.  Despite the many and various avenues for legal redress, the courts simply cannot right every wrong in the business world.  Defendants' Motions to Dismiss are granted, and this case will be dismissed.

An Order of Dismissal consistent with this Opinion will be entered.


DATED: October 29, 2010                    /s/ Janet T. Neff
                                          JANET T. NEFF
                                          United States District Judge